Good morning, Your Honors. It pleases the Court to speak before the Supreme Court on behalf of Mr. Lamothe, the appellant. And if I may, I would like to reserve three minutes for rebuttal. Keep your own time. Go ahead. The Court has now added the previously uncertified issue of closing argument to the mix in this case. And I think it's very important that that is before the Court, because I see that as the principal. It's here. Don't waste time. It's the principal issue in this case. And you have a number of other issues that are present, and they're present for more than one reason. They're present on the issue of the error itself, but they're also present on the issue of the fundamental unfairness of the trial in this case. The starting point on this case has to be looking at what the facts are that need to be considered in terms of the issues in this case. The Court of Appeal, the Sixth District Court of Appeal, when it considered the conviction, did a rendition of the facts under the substantial evidence rule. That is not the correct way to analyze the facts in this case. The facts in this case have to be looked at in terms of all the evidence that came before the Court. And so I went through, and I apologize for the length of it, but it was necessary to go through in painstaking detail. Somebody turn off your phone. Go ahead. I found it necessary to go through in painstaking detail the facts in this case, not just the facts where if you ignore the conflicts in the evidence, the facts are such. You needed the conflicts in the evidence. You have to look at the conflicts in the evidence to determine should the conspiracy evidence have been brought before the Court. Should the issue of improper allocation of the burden of proof and self-defense affect the outcome of the case? Well, why don't you take one of the issues at a time so we can talk about that. Did you want to take the argument, the oral argument issue? I'll take the oral argument issue. Could I ask you about that? Sure. Because I read the, I think we all read the oral argument. The first thing the judge did, the trial judge, is he gave him an opportunity on count one to say whatever he wanted, correct? No, not really. What he did was he said, you will take each count separately and talk about the count separately. Right. And you're the lawyer. You didn't try the case, right? I tried the case. And you didn't say anything like, no, I don't want to do that, I can't do that or that, I object. Actually, the most I said was it would make it difficult for you. You're tying your hands or something. And that was later on. Yeah. And it was. It was making it extremely difficult. You didn't say that before you went ahead. Well, when I went ahead, I went ahead because I was told to do that. I was directed. It was, it's, you're asking me a question. You could have objected and said, Judge, I can't do it that way. You have to look at all the counts together. And I did that eventually. I did state to the judge that this is tying my hands. I can't. Somebody had already convicted him on counts one and three. Counts one and three. And on count one, what you could have done is you could have said, look, I'm going to argue, and I've got a, this is page 513 and 514 of the transcript. What you could have said is, look, to understand why he's not guilty on count one, you have to take into account the doubt on all these counts. But you didn't, you could have raised that argument. He didn't prevent you from raising that argument. Well, first of all, I didn't understand what the court's intention was until it had come to a conviction on count one. The court did not announce up front that it was going to go through and take each count, take the argument, and then render a decision. You didn't, even after he says on page 515, line 16 and 17, so I find him not guilty on count two, you didn't say anything there, or when he found him guilty on count one before that, which is 515, page two, lines two and three. He says, and that would be the court's finding. And you didn't say, look, I object, there's more I have to say. You sort of acted, you went with the flow, is what happened. I was essentially forced into doing that. I didn't have a choice of going through and making arguments that the court was not going to listen to. See, lawyers always do that to me. Well, perhaps that was the ---- They object. And they say, Judge, this isn't fair, this is unreasonable, you can't do this. I object. Could you at least note my objection for the record? I'd like to preserve that objection. I hear that every day. Well, this certainly was not a, this was a unique situation. And I'll tell you it was a unique situation. I've tried over 100 cases. I've never had a judge tell me that you're going to argue these count by count, and that I'm going to convict your client of count one before you have to go through an argument on the other eight counts, and that you're only to talk about each count individually. This was something that hit me in a rather unique way. It was not something I was expecting. It was not something that was typical. And you've got to remember, we're starting with a judge who's saying, in complete ignorance of Herring v. New York, is saying, this is a court trial. I don't have to accept any oral argument from you. Were you aware of Herring v. New York? Pardon me? Were you aware of it? At the time of the ---- Nobody objected when he made that misstatement of law. No one pointed out, said ---- No one said time out. Yes, I do have a right to make an argument under the United States Constitution. As a matter of fact, the court says there's nothing more important than allowing a lawyer to render his ---- Frankly, I didn't have that case in front of me at the time. So you didn't know about it either. Conventional wisdom forever in California, I tried thousands of these cases, was you did not have a right to an argument at a bench trial. Herring made it clear that wasn't correct. And I've always understood that you do have the right to argument at a bench trial. He didn't make that objection. Well, I mean, I don't think ---- This case has never been ---- We've been through countless number of courts. No one has ever taken the position, certainly not the Respondent, that there was a waiver of this issue by failure to object. No, we're just looking at what happened. I understand. And the reason that it happened the way that it happened was this occurred essentially by ambush. This was a manner in which the case proceeded that was not expected by anybody that was participating in the trial. No one expected that the court was going to try to control argument in this fashion and cut off argument in the fashion that it did. Had you tried court trials with that judge before? I have tried. I believe I have tried a court trial with him. I certainly have had jury trials with him. I've never had any issue like this come up in a trial with Judge Baldwin. I've never had this issue come up in a trial with any judge. I've never been cut off in closing argument. This was not ---- The arguments that have been raised thus far have been that the closing argument issue is that our concern is the noncontiguous argument and we essentially got to argue enough of what was there. There has never been any type of an argument that this was waived by virtue of how it proceeded. I understand. And I don't think anybody expected at the time that it happened that it was going to proceed in this fashion. The problem is now you want everything undone after all this time. Really everything has only been found guilty in a final form of counts one and count three. The other one the judge found guilty was count eight, but the State Court of Appeal undid that one, correct? That's correct. And that was on a technical issue, not on any of the issues that are here. And that's the one that you really contend that he didn't have an opportunity, that you didn't have an opportunity to argue, right? No, actually count three there was no opportunity to argue count eight. Well, because count three was the use of the pepper spray. That's right. And he said you got any technical defense because you already argued whether he had assaulted her or not with the pepper spray for count one. That's correct. And there was nothing that prevented you later on when he started acquitting your client of a couple of counts to say, look, Judge, it's for those reasons that I'd like you to revisit count one, count three, because you see that there's issues as to whether she's telling the truth on those, and if she's lying about those, she could be lying about these. The problem is you're now coming to us and saying, look, I went along with this. Now you take care of it for me. But I don't think I went along with it. I think I was trying to make the point to the judge all along that there were other issues in the case. There was self-defense issues. There was defensive property. There was issues of his concern about her harming herself if she got into the house and got a hold of a weapon. There were a number of issues that were driving him to do what he did in that particular situation. And I was making that clear to the judge all along. But you could have argued that for count one. It was made clear throughout the trial that all along we were arguing that her subsequent behavior from October of 1999 up until November of 2000 when the last charge occurred, that all of that conduct was relevant to the issue of whether the October incident. And you had an opportunity to present that, didn't you? In terms of evidence, we had some opportunity to present that. The court kept cutting us off and, in fact, stated that evidence of the conspiracy is not before the court and told us that the conspiracy, I would not consider the conspiracy as to somebody who's not part of it. You're talking about a different issue. Maybe I don't have any further questions on the argument issue. But I think you have to look at all those issues together. You want to go to the conspiracy? We can talk about that. The big evidence that you're talking about is that they didn't allow someone else to testify. That person who wasn't a defendant said that they were going hunting for your client, right? Essentially, the complaining witness was able to get on the stand and say that she had never done that. She was involved with an individual in a number of different ways. She had made a phone call to Charlene Gallegos, one of the defense witnesses, in which she talked about her involvement with Marcus Campagna and attempting to get that witness involved sexually with the two of them. And then – It's Campagna's statement to Gallegos that you wanted to offer, right? Yes. Okay. Did I get it right? That's correct. And it was Marcus Campagna's statement to Charlene Gallegos that they had gone hunting. That's correct. Now, you did cross-examine the complaining witness, correct? I was able to cross-examine the complaining witness, but she just denied that – So why didn't you call Campagna as a witness? Actually, at the time, the reason Campagna wasn't called was he was evading the subpoena process. Well, did you ask for a continuance so you could get him? Or ask the court to help you? And what would that have added to the mix? Did you? Did you first? No, I didn't. Okay. And, see, then you could have called Campagna and say, Mr. Campagna, didn't you go Andre hunting? No, I didn't do that. Well, didn't you tell Charlene Gallegos that you were going Andre hunting? No. Well, then you can impeach him with the statement. But his statement about that there was a conspiracy previously is not one that fits within the exception for co-conspirator statements. Actually, it would, because one of the co-conspirators is in front of the court, which is Jennifer Huber, because she's there as a witness for the prosecution. This is a little different than the normal situation. But the problem is not in furtherance of the conspiracy. He's just telling Gallegos it's like two people who are going to rob a bank. And someone who's one of the conspirators says to someone, you know, his friend, hey, you know, I think we're going to rob a bank. I'm thinking about robbing a bank. That's not in furtherance of the conspiracy. It's just a gratuitous statement to someone else. It's pure hearsay. I disagree, because there was more than just a simple one statement of I'm going to go Andre hunting. It was talking about the Andre hunting. It was talking about there were statements that were made to Charlene Gallegos to threaten her, to essentially keep her from being a witness in the case. There was a whole host of conduct-related issues that these people were doing, attempting to dissuade Ms. Gallegos. There was a chase of Jennifer Huber chasing Charlene Gallegos in her vehicle. All of these types of things were being brought in to show that there was an ongoing conspiracy that was going on that was in furtherance. And what was being done was in furtherance of the conspiracy, because it was attempting to get further charges that could be garnered against. You're not complaining about all that. You're complaining about not allowing this statement into evidence. It was more than just one single statement, though. We were attempting to bring this in through Ms. Gallegos, and the court essentially cut off the line of questioning that had anything to do with statements by Marcus Companion. Well, but isn't the issue that you've raised on appeal not allowing that statement? There's no proffer that you've made as to what you told the judge you wanted to offer. I'd have to look back at the record. I thought there was actually some fairly extensive discussions on the record with the judge about the nature of the conspiracy. Are you saying you raised those in your brief, or you just raised those? I believe I did. I'll have to go back and look. In any event, the we have essentially the two issues. One is the perjury question. And the primary issue that has been raised by the Respondent as to that is that under Nepew, the perjury, if not known to the prosecution, cannot be relied upon as constitutional error. The district judge in deciding this case, Judge Wilkins, cited to the Jacobs v. Scott decision. It's actually a dissent that she was citing to in reliance on that. And that dissent talks about the Durley v. Mayo case, Supreme Court decision, which ended up decided on a lack of jurisdiction, but four of the justices talked about the fact that they would have found a clear due process violation in the situation where, even though the prosecutor didn't know of the evidence being false at the time, that the prosecutor now knows that the evidence was false at the time and can't maintain the continuance of that conviction. That's four of the justices? Four of the justices. Where does that get us? Pardon me? Where does that get us? It doesn't get you anything in terms of a precedent to look at and rely upon. Then why do you cite it? Because it's cited by the ‑‑ it was actually cited by the district judge in deciding the case. It doesn't get us anywhere. Well, it gets us somewhere to know that there is a number of justices that would look at this and say, There is no case law that says that perjury that is not known to the prosecution does not satisfy constitutional violation. We have to use clearly established Supreme Court law in this context, don't we? And you're telling us there is none. The clearly established Supreme Court law in this context is in the context of having one additional element, which is that the evidence is known to the prosecution. I don't think that the existence or requirement of that element needs to be there in order for the violation to occur. You've got perjured testimony, and even if it doesn't, the one point that should be noted is that the perjury that's used tells you something about the fundamental fairness of this trial. And so if there's another error that occurs in this case that is a basis for reversal, you have more evidence of the fundamental unfairness of this trial. You're down to two minutes. Can I ask you one sort of technical question? With the declarations that were filed in the trial, were they signed? Yes, they were. Those were signed. Those were submitted to the 6th District. The signed copies were under seal. Actually, the signed originals were under seal with the 6th District. And certainly if that's an issue that needs to be brought up, I'm sure the copies can be obtained from the 6th District and provided to this Court. Okay. Because your adversary makes a point that they weren't signed. Unsigned. You're saying they were unsigned. The originals were in fact signed and were submitted under seal to the 6th District court of appeal. Okay. Thank you, counsel. Could I ask one question? Could I ask one question? Sure. On the issue of closing argument, when was that raised in the state courts? It was raised in the 6th District court of appeal. It was argued and rejected. On direct appeal? On direct appeal, as well as the petition for review to the California Supreme Court. Okay. Thank you, counsel. Thank you. May it please the Court, David Baskind for the people of California. Let me apologize first for the short time frames. We've expanded the COA on you and given you a very, very short time to respond. That's because of some internal rules that we're working on to try to flag these things earlier. But have you been able to file a supplemental brief? Yes, Your Honor, I have. I'm sorry, you haven't received it, huh? No. Well, I've been on the road from Idaho for a few days, so. We filed it on Thursday, which was the last day. And I understand counsel did not receive it either in the mail. I faxed it to him on Saturday. He didn't receive that, so I apologize for that. It's not your fault. In any event, you're prepared to proceed on that issue? Yes, I am. Okay. Go ahead. Thank you. A couple of preliminary comments about what counsel said. First of all, I'm very happy to hear him ask to talk about the facts. He doesn't talk about the facts at all in his briefs. I'm very happy to talk about the facts. I believe they're very strong in the people's favor. And I will discuss them at the end of my argument in terms of harmless error analysis. Counsel misspoke when he said that we did not raise the waiver issue. In the direct appeal, we did not raise the waiver issue as to counts one and three because we argued that he did have opportunity for closing argument. We did raise the waiver argument in the direct appeal as to count eight because the trial court did not let him argue about that count. And we said the only way we could win that was on waiver. The court of appeal did not reach that issue because they overruled that count on an unrelated issue. So we did raise waiver. Well, did he raise on appeal or even to the California Supreme Court on petition for review the fact that it was error if it was for the judge to do the counts seriatim? I don't believe that he did. It's a little unclear to me exactly what he's arguing is the error, whether it was because he got cut off on one of the arguments or because of the whole nature. But I don't think there's anything. I don't think he breaks it down. And I've tried to do that in the brief that you haven't seen, where I try to break it down and say, you know, first of all, there's no error doing it count by count. There's no Supreme Court law. And under Herring, there's a great deal of discretion for the trial court to do what he sees fit. So that's my first argument, is that there's no way that he can prove that just doing it count by count is a violation of Federal law because no Supreme Court case has come close to saying anything like that. And I think, you know, our experience in appellate courts is we talk about things one at a time. Courts often tell us what they want to hear. And I know that they're different situations, but they are analogous. And in terms of the first count, the Court has already pointed out that the trial court said, what's your argument? Counsel said what he wanted to say, and the Court said, fine, I hear you. I'm finding him guilty. At no point did counsel say, Your Honor, I have more to say, but wait, or anything like that. And the transcript shows no interruptions. Exactly. All right? As for count three. Count two, I don't need any argument on that. Not guilty. Right. Count three. Count three, he was found guilty of using tear gas. The statute, this is what I say in my brief, the statute plainly says that you may not use tear gas except in self-defense. No ifs, ands, or buts about it. That is what the statute says on its face. Only in self-defense. Counsel tried to argue defensive property. Trial court said, you can't say that. There is no defensive property defense in this charge. It's self-defense. Do you have anything to say? He said no. He didn't say anything. Well, count three is a bit of a problem. First of all, you have a trial judge who's operating under a misapprehension as to what the Constitution requires. Probably like many in California, he still hadn't caught on to the idea that there is a constitutional right to argument at a bench trial. You know, long previously some people thought there was, some people thought there wasn't, but it hadn't been really established. But this judge was operating under a misapprehension of the law. And the way I read this transcript, the judge had already made up his mind before the argument started, which may happen at a bench trial. But especially on count three, it appears that he did limit the argument. He says, count three, I presume there's no issue that's been raised before me, et cetera, et cetera. I presume there's no issue that self-defense, the evidence is certainly insufficient to justify a finding that was used in any form of self-defense. So, I mean, before the argument, you know, first the verdict, and now that I've told you what the verdict is, then you can argue. I mean, that seems upside down and backwards. He says that there's some technical defense. And then he goes on a little bit on that. The judge keeps talking. He keeps saying what he's going to do. So I don't think there's any choice but to find by proof beyond a reasonable doubt that the defendant did in fact violate count three. And the way I look at the transcript, there's been no argument at all by counsel on count three. He just says, sorry, I've heard the case, and it's guilty. And then he says, unless there's something you're going to suggest of a technical defense. Mr. DeFilippis, I don't characterize it to be a technical defense. It's a defense of property. She has unauthorized interruption. He doesn't let counsel finish. That's not a technical defense I was referring to. That's a factual defense, Mr. DeFilippis. That's correct. And then the judge goes off again for pages and without allowing any more and says, guilty. It doesn't seem to me that counsel was allowed to argue that point at all. The judge made up his mind before the argument and cut off counsel at every turn. Why isn't that a problem? I understand what you're saying, Your Honor. The question is, what did counsel want to argue? I don't know. The judge cut him off. Well, why doesn't counsel tell us in his brief what he wanted to argue? What is it that he wanted to say? Now, the statute says on its face there is only one justification for using tear gas. Are you now arguing harmless error? No, I'm not, Your Honor. Okay. Go ahead. No, I haven't gotten there yet. The statute says only one reason to use tear gas, and that is self-defense. That is the only defense, that is the only argument that makes any sense for him to raise in closing argument. He comes into court. The judge says, what is your argument on self-defense? It doesn't look like you have any, but what do you have for me? What is your technical argument? He starts talking about defense of property. That is not a defense to this crime. Why does the court have to listen to him make an argument that is totally irrelevant and besides the point? There is only one defense that he can talk about, self-defense, and he doesn't have to talk about it. So why should the judge – if you had an issue that I was talking about right now and I was completely off the mark and talking about something that was completely irrelevant, you wouldn't sit here and listen to me. You'd say, Mr. Baskine, there's only one issue here. Please talk about the issue. And if I had nothing to say about the issue, you'd say, well, let's move on. There's nothing here. That's my argument. You're saying that the only defense as a matter of law that he can raise on count three is self-defense, not defense of property? That's correct, Your Honor. Where do you get that from? The statute says you may only fire tear gas in self-defense, period. That's what the statute says. So what you're saying is you cut him off in arguing an inapplicable defense? Yes, Your Honor. Because you'd already argued self-defense on count one, which is the same as count three. It's just count three is doing the assault with the tear gas. Right. And I would argue that he was given an opportunity. Give me a technical defense. In other words, tell me about self-defense, which is the only defense that's available to you. And he didn't say anything. Was the court confused? The court says a factual defense is that he was using it to protect his property. And I could not find from the state of the evidence that it was necessary in any sense for him to pepper spray this victim in order to protect his property. Was the judge confused there? No. Why didn't the judge say protecting property doesn't qualify, period, instead of saying I don't find any factual basis for protecting property? There's no evidence that she was trying to steal his property or take his property. She was merely present, and he apparently did not want to continue the discussion, so that finding will stand. Your Honor, I'm not exactly sure what the judge was thinking, and I agree with you that he had a misperception about what the defendant's rights were as far as the argument. But the fact is that there was only one defense that Appellant could raise, and he didn't raise it. And he was given the opportunity. I think when the judge said, give me a technical defense, he was saying, give me a self-defense argument, because that's a technical defense. That's the only thing available. You know, and then later on, the judge, when Mr. DeFilippis does say, I'm finding this to be extremely handicapped to me because there is cutoff. Counsel gets cutoff again. And then the judge chews him out. If it's a handicap to you, DeFilippis, let me point out to you, I'm under no obligation even to allow you to make a closing argument. In a court trial, I don't have to have any comments from you. I assume that – I assure you I've taken notes, heard the evidence, I know the law, and your remedy is not by way of argument to dissuade me any more than obviously I'd be dissuaded from your position as far as these cases are concerned. I mean, he's announcing I've made my decision. Don't try to argue anything. You're right, Your Honor. And that was – he was wrong. There's no question about it. But it's actually quite understandable why he was saying that. I mean, obviously he misunderstood the law. But the facts were such that Appellant was guilty, clearly. Appellant testified, and he didn't say anything that cleared him of these two counts. And the judge was right. I mean, there's nothing that Mr. DeFilippis could argue that was going to get him out of this because he basically admitted that he didn't do it in self-defense. He admitted that he sprayed – tear-gassed, pepper-sprayed the victim. And he didn't come up with a valid self-defense argument. So he was pretty much guilty. There wasn't really anything to say. And we don't hear anything in the briefs about what he would have said. He talks about some very irrelevant conspiracy evidence that arose months later from a witness who never testified. The victim did testify. She denied it flat out. So – but in any case, you're right, Your Honor. The trial court did not understand counsel's right to argue. But taken – putting that aside, what happened there was not a violation of Federal law because counsel had only one argument to make, and he didn't make it. And he had a chance to make it, and he didn't make it. And I can move on if that's okay. As for the supposed later discovered evidence, I have raised the issue that these declarations are not signed several times at several courts. I have only just in the reply brief learned that there are supposedly signed copies of these. I have no idea why I haven't received the signed copies. I don't know why they weren't filed in the district court. I don't know why they weren't included in the excerpts of record in this court. I don't believe that even the unsigned declarations were included, although I might be mistaken about that, in this court, in the excerpts of record. In his argument, in his brief, he doesn't even discuss the facts of what is said in those declarations. I don't believe he even mentions the names of the people who signed the, who wrote, ostensibly wrote the declarations. I don't think there's much there. His claim is that, you know, if he provides any evidence that there was perjured testimony in a trial, he gets the right to a new trial. And that just can't be right. Not only is there no Supreme Court law on it, but just imagine if any person, any defendant convicted of a felony, could come up with an affidavit or a declaration saying, you know what, I had a conversation with that witness, and they told me they lied on the stand. Do you know, imagine how many prisoners sitting in prison would come up with a declaration from a friend, from somebody, if that's all it took. It's very clear from NAPU that the prosecutor has to know that there's perjured testimony for it to be a violation of the prosecution. Now, as far as the exclusion of Gallego's testimony, he claims that there was a hearsay exception in his brief. He just says it. The district court said, no, you're wrong. He says it again in his brief in this Court. He doesn't offer any authority whatsoever, not California authority, not Federal authority. He can't just say there's a hearsay exception and leave it at that. He has no basis, no proof, and several courts have said he's wrong. If Compagna had such compelling evidence, then I think perhaps counsel should have done a better job serving that subpoena. We don't have any evidence that he tried once, twice, three times. If he was evading, I mean, we don't know if he could have gone to his place of work. I think it's just not reasonable to say that we should have brought in, you know, hearsay evidence about a third party who has never brought a note showing his due diligence in bringing that party in. My final argument is harmless error. This case, as you know, is controlled by the ADPA. The appellant does not talk about that provision at all, and that's controlling, and that should be the focus of his argument, and it's not even mentioned. He claims that he's innocent, but he admitted at trial that he sprayed the victim with pepper spray several times. His self-defense claim was not credible. He admitted that he sprayed the victim to get her out of the garage. He never said that she was attacking him. He never claimed that she touched him. He claims that, yes, I put my foot on her, but it's just because I put my foot up and she ran into my foot. Now, that's just ludicrous. There's no credibility there. He claims that he was defending his property, but he never said anything at trial, nothing in his testimony about defending property. And as I was saying earlier, the statute about the use of pepper spray says that the only defense available is self-defense. So the protection of property is not a valid defense anyway. Finally, the victim's testimony was very credible, especially when compared to appellant's testimony. She made contemporaneous statements to an officer, as did appellant. The officer testified at the trial, said what she said soon after the assault. Appellant brings in a lot of supposed evidence about things that happened months and months later. She changed the story, and this is all just about a love gone bad. The fact is, the same day that this attack happened, she said many things about what happened, and she didn't change her story at trial. The investigating officer testified that he looked at her. She had bruises. She had red spotches. So ñ and there were also photographs introduced that were taken at the hospital. So she was very credible. He was not credible. Under the Brecht standard, there's no way that appellant can show substantial injury, unless there are any questions. Thank you, counsel. Thank you. You may respond. At some point in your response, can you tell us what you would have argued if the judge didn't cut you off on Cal 3? Quite a bit. Frankly, I've got to say that in 23 years of trying cases, I've never made an argument as short as the one that you'll find on page 514 of the transcript. I mean, it's seven, eight lines. I've never made an argument that short in my life. What the judge was doing, and I'm recalling it now, going back right now and looking at this, he was just asking us specific questions. He told the prosecution what the prosecution's argument was in four lines. The prosecutor said yes. He then asked me what's the defense position on that. So he's asking a specific question. You know, the question you were asked is what would you have argued. We've read the transcript multiple times. What I'm saying is, and this is really more to what we were talking about earlier, this was not a position where I was told go ahead and argue count one. Judge Moskowitz asked you what you would have argued if you'd been given an opportunity. Had I been given the opportunity at this stage, I would have argued the entire gamut of the evidence as, if you look at. And argued that it showed what? That the garage incident occurred, that following the garage incident that Ms. Huber admitted. What was the defense to the garage incident? The defense to the garage incident was multiple. It was he was looking to protect not only himself, but his property. Okay, so let me stop you right there. Counsel says that that's not a defense. It actually, it is a defense. And the judge was not incorrect about that. And I've never seen any law that indicates that defensive property would not be inappropriate. Have you read the statute the other side refers to? Well, the first time that that's ever been referred to has been in the supplemental brief. And I just saw the supplemental brief in court earlier this morning. It was provided that by counsel. That's the first time that's ever been raised. So under California law, if somebody's taking your property, you can pepper spray them, tear gas them. I believe that that would be, if it's reasonable force under the circumstances, there's always been, she was clearly a trespasser. She admitted at the trial to being a trespasser. She knew that the garage. You can't shoot a trespasser with an automatic bow and arrow either. Absolutely not. But you can use reasonable force as necessary to eject the trespasser. So the limits would be reasonableness of the use of force. Your client's testimony was, I just wanted to diffuse the situation. I didn't want any more touching, and I just wanted her to go away. I didn't want to be around her anymore. That's part of the testimony. There was also testimony that was elicited, I think, both before and after that testimony. And I don't have the sites to it in front of me right now. But there was other testimony where he talked about the fact that he was concerned because of her mental state. And her mental state was such that, remember, she had called him some 50 times. She had left six or seven dozens of roses on his front porch that day. She had followed him to the gym. She had gone out into the parking lot afterwards and grabbed onto the steering wheel of his car as he's trying to drive away to stop him. She then followed him in the car, raced up behind him, screeched to a stop behind him, got out of her car and raced through the garage door as the garage door was closing. All of this was showing some very high level of instability on her part. She was emotionally distraught. Did he testify I did it for self-defense reasons because I was afraid she was going to inflict bodily injury upon me? Yeah, that she was going to hurt him, that she was going to hurt herself, that she was potentially going to gain a weapon from inside the house and either hurt herself or him. And I know that I referred to that in the statement of facts in the open brief. So that's what you were prepared to argue? That's correct. I would have argued all of those, and I would have talked about the existence of that conspiracy because the conspiracy, remember, she admits the evening of the October incident, she admits that what she said to the police was false. She then carries on a relationship with Mr. Lamothe for the next seven months. She gets caught with Guy Maury in the restaurant by a friend of Mr. Lamothe's, and because of that, he breaks up with her. As soon as he breaks up with her, she then all of a sudden starts making up these charges. She elaborates on the charges. The only thing I don't understand is why didn't you tell the trial judge that you wanted to bring all this and make all these arguments? I mean, maybe it was you thought you would displease him, and he's making a decision as to whether your client's guilty or not. Well, there's a lot of things that you have to go through in that process, but that's one of them, certainly, as well as the fact that I really didn't have the opportunity to do it. I suppose I could have cut him off. That certainly would not have. It was obvious from his demeanor that he had made up his mind about this entire circumstance before he even started the closing argument process. It seemed to be futile to try and raise the arguments that he was cutting me off from making, you know, to make a record of what those arguments would be. Now you're saying, but we should issue the writ and say retry him again so I can make all these arguments. I mean, if you had made the arguments before that you elected not to press those arguments because you didn't think it was going to do any good before that judge. Isn't that the basis for a waiver, really? No, no, no. No, I'm not saying that it wouldn't do any good. I think that a reasonable person listening to those arguments would have understood the circumstances and would have acquitted Mr. Lamothe of the charges. That's what I'm saying. Why didn't you then say, Judge, look, I want to bring all these things to your attention? Because this judge had already made up his mind and he was already cutting me off and he was stopping me from making the arguments in the first place. So it didn't seem to me that there was an appropriate method of being able to go to him and say, well, I want to make a record where I get to make all of the arguments that you're telling me I can't make. Well, the transcript doesn't show that on count one. What's the defense's position? And then you argue about the self-defense. But I don't really argue. You say Mr. Lamothe does not deny the use of pepper spray, but his defense is that he was using it in self-defense as well as in defense of his property. She was inside his residence. The garage is a portion of the attached residence. And because of that, he has a right to defend himself, period. In court, I think I understand the factual contentions on that matter. What he gave was a four-sentence or four-line summary of the prosecution's position, and then he asked me, what's the defense position on that? I answered his question, and before I can get into any argument, he states, I think I understand the factual contentions on that matter. The court's prepared to rule as to count one, and then he goes on to find Mr. Lamothe guilty. This was not a situation of where I was allowed unfettered argument as to even count one. Counsel, your time has expired. We understand your position. We thank both of you. And I'm not going to order this case submitted yet for argument because I haven't read the brief that's been submitted. So we'll take a look at that. Your Honor, would it be possible, I know the court probably doesn't want more briefs, but I just saw that and I really haven't had a good opportunity. This is why I'm deferring submission. So we get an opportunity to look at the brief, and then should we decide that you ought to be heard from in response, we'll let you know. Okay. Thank you. So this case will remain pending, and we'll let you know when submission occurs. Thank you both very much.
judges: Schroeder, Trott, Moskowitz